IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 10 CR 342 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| MIROSLAW LAGUNA | ) | |

## MEMORANDUM OPINION AND ORDER

A federal grand jury charged Miroslaw Laguna ("Laguna") with intentionally acting to prevent and hamper his departure from the United States pursuant to an outstanding removal order. *See* 8 U.S.C. § 1253. Laguna moved to dismiss the Indictment alleging that his underlying convictions, which were the basis for the removal order, were obtained in violation of *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010). Laguna argued that because his previous counsel failed to advise him of the immigration consequences of his guilty plea before entering it, contrary to the requirement now set forth in *Padilla*, the Indictment must be dismissed. For the following reasons, the Court denies Laguna's Motion to Dismiss the Indictment.

## BACKGROUND

Laguna, a Polish citizen, entered the United States in December 1967 as a legal permanent resident. On June 24, 2001, he pled guilty to possession of a stolen vehicle, aggravated fleeing and eluding a police officer, and aggravated DUI in the Circuit Court of DuPage County. It is undisputed that before entering the guilty plea, his court-appointed attorney did not inform him of the immigration consequences of his guilty plea. As a result of these convictions, the immigration court entered a removal order on September 18, 2002 ("2002 removal order").

On March 14, 2002, due to these convictions, the U.S. Bureau of Immigration and Customs Enforcement ("ICE") served Laguna with notice of its intent to deport him from the United States because he committed two crimes of moral turpitude. On May 2, 2002, ICE added two additional charges to deportation because Laguna committed two crimes that were aggravated felonies.

An immigration judge issued a final order of removal on September 18, 2002, requiring that Laguna be removed to Poland upon his release from the Illinois Department of Corrections ("IDOC"). At the removal hearing, Laguna admitted the allegations of fact regarding the 2001 convictions but argued that he was a U.S. citizen because his mother was a U.S. citizen. The immigration judge rejected this argument and ordered that he be removed.

Laguna appealed to the Board of Immigration Appeals ("BIA"), which affirmed the removal order without opinion on February 5, 2003. Laguna then challenged the removal order by filing a petition of review with the Seventh Circuit. On June 4, 2004, the Seventh Circuit granted Laguna's request to transfer the petition to the district court, which denied the petition on August 27, 2004. *Laguna v. U.S. Dep't of Justice*, 333 F. Supp. 2d 748 (N.D. Ill. 2004).

After being released from IDOC on June 18, 2004, Laguna was taken into ICE custody. ICE released Laguna on September 24, 2004 under the condition that he help ICE in obtaining his passport and other travel documents necessary to be removed to Poland. These documents had to be obtained because Poland required its citizens to present a Polish passport upon entering and leaving the country. Laguna agreed to his release on these terms.

On September 29, 2005, Laguna provided ICE with receipt of a mailing to show he had applied for a Polish passport. Further, on March 10, 2010, Laguna provided ICE a receipt also indicating he had applied for the passport, which would be ready to be picked up on April 21, 2010.

When Laguna reported to ICE on April 21, 2010, he refused three times to go to the Polish consulate and pick up the passport. ICE informed Laguna numerous times that if he did not sign the necessary documents to obtain his passport he would be charged with a federal crime. Laguna understood this warning but refused to take action as ICE required.

A federal indictment returned on May 19, 2010 charged Laguna with failing to comply with this 2002 removal order by intentionally acting to prevent his departure from the United States. Since being released from the Illinois Department of Corrections in 2004, Laguna has failed to assist Immigration and Customs Enforcement in obtaining documents, such as a passport and other travel documents, necessary for his removal to Poland.

## DISCUSSION

Laguna contends that the 2002 removal order was a "condition precedent" to the charge in this case. As such, because Laguna's attorney did not advise him of the deportation consequences of his guilty plea, in violation of *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010), the charge cannot stand. In other words, Laguna maintains that he cannot be convicted of hampering a removal order that was never valid in the first place. *See* 8 U.S.C. § 1252 (b)(7)(C).

I.      **Collateral Challenge of 2002 Removal Order**

A defendant cannot always collaterally challenge a removal order. Under 8 U.S.C. § 1252(b)(7)(A),

> *If the validity of an order of removal has not been judicially decided*, a defendant in a criminal proceeding charged with violation section 1253(a) of this title may challenge the validity of the order in the criminal proceeding only by filing a separate motion before trial. The district court, without a jury, shall decide the motion before trial.

Laguna argues that this statute is permissive, not restrictive, because it affirmatively "does not take jurisdiction away." (R. 45, Reply Br. at 3.) But by requiring that, in order for a defendant to challenge a removal order there must be no previous judicial determination, the statute affirmatively bars challenges that do not satisfy this precondition. Read in the context of the entire provision, the inclusion of "may" does not make the statute permissive. Assuming first that the "judicially decided" condition is met, "may" merely provides defendants with the opportunity to challenge the underlying removal order if they choose to do so. A plain reading of the statute does not suggest otherwise.

Laguna cites to *United States v. Lopez-Mendoza*, 481 U.S. 828, 839 (1987), for the proposition that because his criminal conduct is tied directly to the removal order, he must be provided an opportunity to challenge it. In *Lopez-Mendoza*, the Supreme Court held that the language and legislative history of the illegal entry statute, 8 U.S.C. § 1326, indicated that a defendant could not challenge the validity of the deportation in the § 1326 proceeding. *Id.* at 836-37. But the court can review the administrative proceeding where "defects" in the administrative proceeding itself would prevent future judicial review of that proceeding. *Id.* at 838. Because the immigration judge inadequately accepted defendants' waiver of appeal rights, defendants were deprived of the chance to "challenge the predicate conviction in a judicial forum." *Id.* at 841. As a result, the Court affirmed dismissal of the indictment. Unlike *Lopez-Mendoza*, there is no indication here that the immigration judge's actions during the deportation proceedings incorrectly or inadequately informed Laguna about his right to seek review of the decision. The facts suggest the opposite, as Laguna sought judicial review of the deportation decision with the Board of Immigration Appeals and the Seventh Circuit.

Here, the 2002 removal order has been judicially determined.[1]  Laguna appealed it to the Board of Immigration Appeals, which affirmed the decision.  After that, he filed a petition of review with the Seventh Circuit, which granted Laguna's request to transfer his petition to the Northern District of Illinois.  The district court denied the petition on August 27, 2004.  *See Laguna v. U.S. Dep't of Justice*, 333 F. Supp. 2d 748 (N.D. Ill. 2004) (Shadur, J.).  Because his order of removal has been judicially decided, this Court has no jurisdiction over it *See* 8 U.S.C. § 1252(a)(5)(vesting exclusive jurisdiction to conduct judicial review of an order of removal in the Court of Appeals).  Laguna already sought that review which resulted in the Seventh Circuit granting his request to transfer his petition to the district court on June 4, 2004.  On August 27, 2004, the district court denied the petition.  *See Laguna* 333 F. Supp. 2d at 748.  The validity of the 2002 removal order has been judicially decided, so under Section 1252(b)(7)(A) Laguna cannot challenge the validity of that order here.

## II.    Collateral Challenge

Even assuming Laguna could collaterally challenge the 2002 removal order, Laguna's claims are insufficient.  To successfully challenge a removal order, Laguna must show a violation of his due process rights and that he suffered prejudice as a result of the alleged errors that led to the faulty removal order.  *See U.S. v. Espinoza-Farlo*, 34 F.3d 469, 471 (7th Cir. 1994); *see, e.g., U.S. v. Ayeni*, 66 F. Supp. 2d 617, 621 (M.D. Pa. 1999) (applying this test, which is typically used for illegal reentry cases, to Section 1253(a) charges of hampering the removal order).

---

[1]   Laguna does not offer contrary argument that judicial review by these courts fails the "judicially determined" requirement.

First, Laguna cannot establish that his due process rights were violated in the deportation proceeding. Laguna alleges constitutional violations with respect to his 2001 convictions, but does not claim a due process violation in the 2002 deportation proceedings. In fact, Laguna does not specifically challenge the removal hearing. Likewise, while due process applies to a deportation proceeding, because it is a civil proceeding there is no Sixth Amendment right to counsel. *See, e.g., Ayeni*, 66 F. Supp. 2d at 621.

Second, the prejudice prong is met where a party shows where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Although the immigration judge here heavily relied on the 2001 convictions in deciding the 2002 removal order, there is nothing to suggest that if Laguna's counsel had warned him of the immigration consequences of his guilty plea, he would not have eventually been convicted in a trial. That is, without any facts to the contrary, there is not a "reasonable probability" that Laguna could have avoided convictions for the 2001 crimes, and therefore deportation, had his attorney advised him of the immigration consequences of a conviction.

## III.    Retroactivity of *Padilla v. Kentucky*

Even assuming Laguna could clear these hurdles, his 2001 convictions and the 2002 removal order occurred years before the Supreme Court's release of the *Padilla v. Kentucky* decision in 2010. Laguna can therefore attack the 2002 removal order with *Padilla* only if the Court finds that *Padilla* applies retroactively.

In *Padilla*, the Supreme Court held that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel. *Strickland* applies to Padilla's

6

claim." 130 S. Ct. at 1482. As such, "counsel must inform her client whether his plea carries a risk

of deportation." *Id.* at 1486. Here, Laguna claims that, under *Padilla*, the 2001 convictions are

flawed, and thus the 2002 removal order based on these convictions is similarly invalid. This

argument, of course, assumes that *Padilla* is retroactive.

*Teague v. Lane*, 489 U.S. 288 (1989), governs the retroactive application of criminal laws.

This determination turns on whether the case announces a "new rule" or merely expands upon a

preexisting rule. *Id.* at 299. In the interest of finality, if a case announces a new rule, it does not

apply to cases that were final before the creation of that new rule. *Id.* at 309, 311. A decision that

applies an established general rule to a unique set of facts, however, is not a "new rule." Two

considerations guide the Court in classifying a decision as a "new" or "old" rule: precedent in the

Seventh Circuit before *Padilla* and the "array of views expressed" in the *Padilla* decision. *Id.* at 301;

*O'Dell v. Netherland*, 521 U.S. 151, 159-60 (1997). In other words, where a decision "breaks new

ground or imposes a new obligation on the States or the Federal Government," or "if the result is not

dictated by precedent existing at the time the defendant's conviction became final," a decision

creates a new rule. *Teague*, 489 U.S. at 301.

Prior to *Padilla*, the "legal landscape" in the Seventh Circuit dictated that the Sixth

Amendment did not require attorneys to advise clients about the possible immigration consequences

of a guilty plea. *U.S. v. George*, 869 F.2d 333, 337-38 (7th Cir. 1989); *see Jimenez v. U.S.*, 154 Fed.

Appx. 540, 541 (7th Cir. 2005) ( "like most other courts to address the question," failure to advise

a client about potential immigration consequences did not violate the Sixth Amendment).[2] The

Seventh Circuit's pre-*Padilla* approach was hardly unique. Prior to *Padilla*, the state and federal

---

[2] Under Circuit Rule 32.1, because *Jimenez* is unpublished it is not binding precedent.

courts were nearly unanimous in holding that informing clients about a guilty plea's "collateral consequences" such as immigration was "outside" the Sixth Amendment.[3] *See* 130 S. Ct. at 1481 n.9 (listing various federal and state courts holding this way). Unless a court "would have acted objectively unreasonably" in declining to grant defendant relief when considering his claim at the time of conviction, a rule is considered new. *O'Dell*, 521 U.S. at 156. *Padilla* thus established a new rule for *Teague* purposes when it required attorneys to inform clients about the immigration effects of entering a guilty plea.[4]

It is unique legal rules created by judicial decisions that drive the retroactivity analysis, not preexisting professional norms. *See Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009) (American Bar Standards, and other directives, are only "guides" for reasonableness of an attorney's representations). The fact that ABA standards and legal ethics publications before *Padilla* expressed the view that an attorney should advise the client about the immigration consequences of a guilty plea is helpful, but not controlling. *See id.* In *Padilla* the Supreme Court considered the historical development of professional standards in creating a constitutional rule that attorneys must advise non-citizen clients about potential deportation consequences. But a "new rule" for *Teague* retroactivity purposes is the constitutional rule created by the decision, not professional norms created by different organizations. There is therefore no basis to find that *Padilla* is an old rule

___

[3] In Justice Alito's concurrence he noted that before *Padilla* "the longstanding and unanimous position of the federal courts was that reasonable defense counsel generally need only advise a client about the *direct* consequences of a criminal conviction." *Padilla*, 130 S. Ct. At 1488 (Alito, J., joined by Roberts, C.J., concurring). "Virtually all jurisdictions" followed this rule. *Id.*

[4] The pre-*Padilla* case law "limited the Sixth Amendment to legal advice *directly* related to defense against prosecution of the charged offense," not advice on indirect issues such as immigration consequences. *Id.* at 1495 (Scalia, J., joined by Thomas, J., dissenting) (emphasis added).

because professional standards before the decision required attorneys to advise clients about immigration consequences of guilty pleas.

A new rule is one that is "susceptible to debate among reasonable minds." *O'Dell v. Netherland*, 521 U.S. 151, 159-60 (1997) (quoting *Butler*, 494 U.S. at 415). For example, a lack of discord within the decision at issue is an indication that it is a new rule. *Id.* at 159. The Justices' different approaches in *Padilla* reveals the distinct and divergent interpretations of the rule. The concurrence by Justice Alito and Chief Justice Roberts sought to lessen the burden on attorneys by requiring them to generally advise clients that a guilty plea may have immigration consequences without having to specify what those consequences may be. *Padilla*, 130 S. Ct. at 1494 (Alito, J., joined by Roberts, C.J., concurring). Accordingly, they believed only "affirmative misadvice" should constitute a Sixth Amendment violation. *Id.* at 1493. The concurrence also noted that *Padilla* was a "dramatic departure from precedent," which is yet another indication that it is a new rule. *Id.* at 1488. The dissent by Justices Scalia and Thomas endorsed yet another view: that there is no Sixth Amendment requirement that attorneys provide non-citizen clients with accurate advice about immigration. *Id.* at 1497 (Scalia, J., joined by Thomas, J., dissenting).

*O'Dell* held that *Simmons v. South Carolina*, which required a capital defendant be allowed to tell a jury that he is ineligible for parole in response to government argument that he will be a future danger, was a new rule; one of the principal reasons was that the Supreme Court expressed an "array of views" in the *Simmons* decision. 521 U.S. at 159. Like *O'Dell*, the division among the *Padilla* Court, in terms of the final result and the analysis, supports the conclusion that *Padilla* created a new rule.

9

Laguna relies on *I.N.S. v. St. Cyr*, 533 U.S. 289 (2001), to argue that even prior to *Padilla* it was "long established" that attorneys must advise non-citizen clients about the immigration implications of entering a guilty plea. (R. 45, Reply Br. at 7.) While *St. Cyr* mentions in a footnote that defense counsel should "follo[w] the advice of numerous practice guides" to advise clients of immigration consequences, it did not create a constitutional requirement that such advice be given. 533 U.S. at 323 n.50. In fact, it was not even a case directly involving the Sixth Amendment.

In addition, under *Teague*, if the decision merely applies an established general rule to a new set of facts, it is not a "new rule." *See Saffle v. Parks*, 494 U.S. 484, 488 (1990). The *Strickland* test for ineffective assistance is a well-established legal principle,[5] and Laguna here argues that *Padilla* simply applied *Strickland*'s competence prong to a new set of facts. (R. 45, Reply Br. at 6.); *see, e.g., U.S. v. Chaidez*, 730 F. Supp. 2d 896, 901 (N.D. Ill. 2010) (Gottschall, J.); *Marroquin v. U.S.*, No. M-10-156, 2011 WL 488985, at *4 (S.D. Tex. Feb. 4, 2011). Specifically, he maintains that because the "beginning point" of the analysis involved *Strickland*, a rule of "general application," *Padilla* is an old rule. (R. 45, Reply Br. at 6).

The language in *Padilla*, however, suggests that the Supreme Court first had to resolve the issue of whether *Strickland* even applied to advice about immigration consequences. 130 S. Ct. at 1482. The Court "conclude[d] that advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel. *Strickland* applies to Padilla's claim." *Id.* Only after making this determination did the Court find that Padilla "sufficiently alleged that his counsel was constitutionally deficient" for failing to advise him that deportation was a likely result of his

---

[5] Two elements must be met to establish ineffective assistance of counsel: (1) that counsel's performance fell below an objective level of reasonableness (competence), and (2) the defendant suffered prejudice as a result of counsel's deficient performance (prejudice). *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

guilty plea. *Id.* at 1486-87. If *Padilla* had skipped the issue of whether *Strickland* even applied in the first place, and instead just analyzed it under the two-prong *Strickland* test, there would be a stronger basis for it being an old rule. But this was not the case. Rather, *Padilla* clarified the threshold issue of whether attorney misadvice about immigration consequences even falls under the Sixth Amendment.

Because *Padilla* was neither dictated by prior precedent nor a standard application of *Strickland* to a new situation, the Court finds that it created a "new law," and as such is not retroactive. As a result, Laguna cannot rely on it to challenge the validity of his underlying convictions.

## CONCLUSION AND ORDER

For these reasons, the Court denies Laguna's Motion to Dismiss the Indictment.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: April 11, 2011